# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 12-00498-KD-C |
| | ) | |
| HAMILTON SMITH, | ) | |
| Defendant. | ) | |

## ORDER

This matter came before the Court for a non-jury trial on June 2-3, 2014 ("Phase II"), at which time the issue of remedies concerning Dams/roads A, B, D and E, were tried. Upon consideration of the arguments, and documentary and testimonial evidence presented, and all other pertinent portions of the record including the parties' post-trial briefs (Docs. 137-142), the Court finds as follows.

## I.     Statement of the Case & Factual Background

This is a civil action arising under the Clean Water Act ("CWA").[1]   The purpose of the CWA is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters.   33 U.S.C. § 1251(a).   Accordingly, the CWA prohibits all discharges of pollutants, including dirt, rock, clay and other materials, into "waters of the United States" except as authorized by a "Section 404 permit" granted under the CWA, or as provided in one of the statute's permit exemptions.   Section 404 requires that, before discharging dredged infill material into jurisdictional waters of the United States, you must obtain a permit from the Secretary of the Army.

Defendant Hamilton Smith ("Smith")'s family owns (and Smith manages) approximately 800 acres of real property in Baldwin County, Alabama.   The property contains wetlands and streams that are protected by the CWA, including Dennis Creek and three (3) unnamed tributaries that flow into Dennis Creek, which are referred herein as Creek A, Creek B, and Creek E.   Dennis Creek flows directly into

---

[1] The CWA makes it illegal to introduce pollutants from any point source into the navigable waters of the United States without a permit.   33 U.S.C. §§ 1311(a), 1342.

the Tensaw River, which is three (3) miles away from Smith's property, and ultimately into Mobile Bay, approximately 15 miles down the Tensaw River.   Between approximately 1998-2004, Smith built five (5) dams on his property at the cost of $180,000 (Doc. 90 at 56; Doc. 103 at 69), which provided roads and resulted in several lakes, referenced herein as Dams/roads A, B, C, D, and E.[2]   Smith did not request permission from the Government before making these improvements, and did not apply for Section 404 CWA permits.[3]   As such, the Government sued Smith for CWA Section 404 permit violations.

The Government has established, and Smith does not dispute, that the tributaries at issue are jurisdictional waters of the United States and that he built the dams/roads using point sources that discharged pollutants.   Smith also does not contest that one (1) dam/road, Dam/road E, was built in violation of the CWA Section 404 permitting requirement.

At the Phase 1 trial (liability only), Smith contended that Dams A-D did not require a Section 404 permit because they were built in compliance with the CWA permitting exemption for forest roads (and for silviculture).[4]   The forest roads exemption covers the discharge of dredged or fill material "for the purpose of construction or maintenance of farm roads or forest roads ... where such roads are constructed and maintained, in accordance with best management practices, [BMPs] to assure that flow and circulation patterns and chemical and biological characteristics of the navigable waters are not impaired, that the reach of the navigable waters is not reduced, and that any adverse effect on the aquatic environment will be otherwise minimized."   33 U.S.C. § 1344(f)(1)(E).   This permitting exemption

---

2 In addition to constructing dams/roads, Smith harvests timber and hunts quail on is property.   From 2000-2011, Smith grossed $100,000 from timber sales, $50,000 of which were for timber sales on the portion of his property where the Dams/roads are located.   (Doc. 90 at 58-60).   In 2006, Smith grossed $72,000 from a quail hunting business on his property (Dennis Lake Wing Club); and from 2007 forward grossed $152,000/year from this business.   (Doc. 90 at 52; Doc. 103 at 69).

3 33 U.S.C. § 1344(a). To establish a prima facie case of a violation of Sections 301 and 404, the Government must prove that Smith is a 1) person who 2) discharged a pollutant 3) from a point source 4) into waters of the United States 5) without a permit issued under CWA section 404.   33 U.S.C. §§ 1311(a), 1344 and 1362 (definitions); U.S. v. RGM Corp., 222 F.Supp.2d 780, 786 (E.D. Va. 2002); U.S. v. Board of Trustees of Fla. Keys Cmty. College, 531 F.Supp. 267, 274 (S.D. Fla. 1981). Under the CWA statutory scheme, the Army Corps of Engineers is the agency that issues CWA permits for the dredge and fill of navigable waters, which can include wetlands. 33 U.S.C. § 1344; Rapanos v. United States, 547 U.S. 715 (2006).

4 For the "silviculture exemption" to apply, "the activities ... must be part of an established (i.e., on-going) farming, silviculture, or ranching operation...." 33 C.F.R. § 323.4(a)(1)(ii).

requires that the roads be constructed in accordance with 15 mandatory Best Management Practices ("BMPs"). 33 C.F.R. § 323.4(a)(6)(i-xv); 40 C.F.R. § 232.3(c)(6)(i-xv). To qualify for the forest roads exemption, Smith bore the burden of establishing that his activities satisfied the exemption's requirements. U.S. v. Brink, 795 F.Supp.2d 565, 582 (S.D. Tex. 2011); Avoyelles Sportsmen's League, Inc. v. Marsh, 715 F.2d 897, 926 (5th Cir. 1983); U.S. v. Akers, 785 F.2d 814715 F.2d 897, 819 (9th Cir. 1986); In re Carsten, 211 B.R. 719, 732 (Bkrtcy. D. Mont. 1997).

At trial, the Government argued that Smith failed to comply with the mandatory BMPs such that he could not avail himself of the forest road exemption, and moreover, even if he could, he still would not be entitled to the exemption because his activities were subject to "recapture"[5] -- an *exception* to the forest roads exemption. To support recapture applying to Smith's dams/roads, the Government asserted that because they altered the ecosystem and affected the hydrology of the jurisdictional waters, the use and the reduction or reach/circulation of the waters was altered.

During the Phase I trial, which dealt only with liability, the jury heard the testimony and evidence, and considered Smith's CWA liability for Dams/roads A, B, C, and D. The jury found Smith liable for Dams/roads A and B (that the forest road exemption applied but so did recapture which removed that exemption).[6] The jury found Smith was not liable for Dams/roads C and D (that the forest road exemption applied and recapture did not). Thereafter, the Government filed a post-trial motion for judgment as a matter of law regarding Dams/roads C and D (Doc. 100), which the Court granted as to D[7]

---

5 Recapture refers to the concept that, despite exceptions to the CWA permitting requirement, if dam construction and resulting discharges significantly alter the "use" of navigable waters and the reduction or reach/circulation of such waters, then the Section 404 exemptions are inapplicable. Section 1344(f)(2) *reinstates* the permit requirement where the discharge of dredged or fill material into the navigable waters is "incidental to any activity having as its purpose bringing an area of the navigable waters into a use to which it was not previously subject, where the flow or circulation of navigable waters may be impaired or the reach of such waters reduced ...." To fall within the exception, both conditions (new use *and* reduction or reach/circulation of waters) must be shown to apply. Greenfield Mills, Inc. v. Macklin, 361 F.3d 934, 949 and 953 (7th Cir. 2004).

6 Dams/roads A and B were found (by the jury) to be in compliance with all 15 MBPs for the forest road exemption but were subject to recapture under Section 404(f)(2).

7 The Court determined that there was insufficient evidence for the jury's determination that Dam/road D complied with BMP 6 (minimal impact on aquatic vegetation) and BMP 7 (movement of aquatic species).

3

but denied as to C (upholding the jury's verdict on C). (Doc. 106). At a later date, this case proceeded to Phase II of the trial (remedies only) regarding Dams/roads A, B, D and E. For purposes of Phase II, the Parties agreed that Dams/Roads A, B and D are located in protected streams and/or wetlands and that each of the dams/roads created impoundments of water of various sizes that inundated protected streams and/or wetlands. Smith also admitted liability for Dam/road E. Phase II then addressed the remedies and damages for the admitted or adjudicated CWA violations by Smith for Dams/roads A, B, D and E.

As damages, the Government seeks injunctions, compensatory mitigation, and civil penalties. Specifically, the Government asserts the following relief against Smith:

- Permanent Injunction: a general *permanent* injunction forever prohibiting Smith's discharge of pollutants into waters of the United States without a permit in violation of CWA section 301(a), 33 U.S.C. § 1311(a). (Doc. 133 at 4).

- Temporary Restorative Injunction (Restoration Plan): a restorative *temporary* injunction relating to a restoration plan (based on the findings of William L. Kruczynski- "Dr. Kruczynski") (Docs. 138-1, Doc. 141-1 (as amended)) requiring Smith, from October 1, 2014 through October 1, 2015, at his own expense and at the direction of the EPA, to fully restore the site by returning the violation areas to their pre-violation conditions through the removal of all unauthorized fill (the earthen material that comprises the dams/roads) from the protected streams and wetlands at the site and planting new vegetation to restore the pre-violation forested wetland condition. (Doc. 133 at 4, 6-7). Included in this request is removal of the dams/roads because there are other ways to cross the streams (*e.g.*, bridges), or at the minimum, Dams/roads A and B should be redesigned via culverts and to restore the flow/circulation of Creeks A and B.[8] (Id. at 5-6, 8). Additionally, the Government seeks 3 years of annual monitoring/reporting to the EPA to ensure the plan is working and the site is being restored. (Id. at 7-8). (See also Docs. 138-1, 141-1). The Government estimates the costs of restoration as **$89,900.** (Doc. 138-1 at 10; Doc. 141-1 at 11).

- Compensatory Mitigation: compensatory mitigation for any unauthorized fill Smith cannot remove, or that the Court determines should be allowed to remain at the site, given the statute's policy of "no net loss" of wetlands. (Doc. 133 at 4-5). For the Government, this addresses both permanent and temporary losses since the fill has been in place (the time of the violations) from 2003 to the present, as during that time the wetlands and streams have not been functioning as they should and there should be compensatory mitigation for those losses. (Id. at 5, 9).

  - *Temporal Losses.* Compensatory mitigation for temporal losses of stream and wetland function due to Dams A, B, D, and E and their impoundments until they are restored, in

---

8 During the Phase II trial and in post-trial briefing, the Government also sought restoration as to Dam/road C (that the water level of Dam/road C be lowered to prevent back-flooding connected to areas upstream of Dams/roads A,B, and D). (See, e.g., Doc. 138-1 at 2, 4-6, 8, 11). However, during the liability phase of trial, Phase I, the jury concluded that Smith satisfied the forest road exemption and was not subject to recapture for the Dam/road C impoundment. The Government is not in a position to demand any form of relief as to Dam/road C and any such request is **DENIED.**

the form of mitigation credits.   (Doc. 107; Doc. 133 at 9-13; Doc. 137 at 6, 20).

- *Mitigation Bank Credits.*   The Government seeks an order specifying that Smith satisfy the requirement to mitigate for temporal losses for more than decade by purchasing credits at an existing mitigation bank[9] in the service area, or nearby within the State of Alabama, in recognition of the preference under applicable regulations (40 C.F.R. § 230.93(b)) for mitigating through mitigation banks rather than through other forms of mitigation that involve further temporal losses and increased risk of failure.   (Id.)

  - Post-trial, the Government produced a specific figure of **$217,365** and requests that this Court require Smith to purchase credits for Dams/roads A, B and E equivalent to 20% of the mitigation that would have been required for the impacts if they had been permitted, to offset the functional losses that occurred during the 12 years the violations remained unabated. (Doc. 137 at 6, 14).   The Government also seeks credits equivalent to 15% for Dam/road D to reflect that its size decreased in 2010 after a large culvert was installed.   (Doc. 137 at 15). The Government adds that the temporal mitigation request will address only the impoundment and not the filling impacts at Dams/roads A, B, and D based on the expectation that these dams will be brought into compliance with the forest road exemption and will not impound water "in which case the remaining fill would not require a permit."   (Id.)

- Compensation for permanent impacts (none if restoration is complete). (Doc. 133 at 13).

- <u>Civil Penalties</u>.   The Government seeks civil penalties against Smith in the amount of **$1,500,000** for the Dams/roads A, B, D and E, pursuant to 33 U.S.C. § 1319(d), depending on the other relief being ordered in full by the Court.

## III.   <u>Conclusions of Law</u>

Guiding the Court's analysis of the appropriate relief to be awarded in this case is the principle that while CWA violations may be remediated in a variety of ways, restoration of a violation site to its pre-violation condition is the *preferred* remedy.   <u>United States v. Cumberland Farms of Conn., Inc.</u>, 826 F.2d 1151, 1161-1165 (1st Cir. 1987); <u>U.S. v. Bedford</u>, 2009 WL 1491224, *14 (E.D. Va. May 22, 2009). <u>See also</u> e.g., <u>Ohio v. United States Dep't of the Int.</u>, 880 F.2d 432, 443-444, 457 (D.C. Cir. 1989) (recognizing that the common law concept of "legal" damages was unacceptable to Congress and that restoration was the preferred remedy).   Restoration, meaning to offset the impacts of violations and

---

9   Explained by the Government as for-profit private enterprises where individuals locate properties suitable for restoration, develop a restoration plan, take that to the Corps of Engineers to obtain approval, and if they can show a benefit associated with the work they will do, the Corps approves the plan and authorizes the company, the mitigation bank, to sell credits to the public.   (Doc. 133 at 9-10).   One restoration wetland credit is approximately $12,000 and the stream restoration credits are $75 per linear foot. (Id. at 13).

remove the violations themselves to return the site to its pre-violation state. The Court agrees that site restoration is a *foremost* consideration, and as such, has given great weight to the significance of accomplishing restoration, over other remedies, when assessing remedies. The Court has also considered that the main purpose of imposing any civil penalties is deterrence -- to deter the violator and others from committing future violations. Tull v. United States, 481 U.S. 412, 422-425 (1987); United States v. Smithfield Foods, 972 F. Supp. 338, 352 (E.D. Va. 1997).

A.    **Injunctive Relief**

The Government seeks entry of: 1) a *permanent* injunction prohibiting Smith's discharge of pollutants into waters of the United States without a permit in violation of CWA section 301(a), 33 U.S.C. § 1311(a); and 2) a *temporary* injunction requiring Smith, as his own expense and at the EPA's direction, to fully restore the site via its proposed restoration plan.[10]  (See also Doc. 133 at 4; Doc. 137 at 5, 7).

In the event of a violation, the CWA authorizes civil judicial enforcement, allowing the United States to seek "appropriate relief, including a permanent or temporary injunction, for any violation." 33 U.S.C. § 1319(b). However, an injunction does not issue automatically upon a finding of a CWA violation. Weinberger v. Romero-Barcelo, 456 U.S. 305 (1982); Amoco Production Co. v. Village of Gambell, AK, 480 U.S. 531 (1987).[11] District courts are not "mechanically obligated to grant an injunction for every violation of the law." Weinberger, 446 U.S. at 313. More specifically, the CWA does not require a district court to grant injunctions for all violations of the act, but instead the CWA "permits the district court to order that relief it considers necessary to secure prompt compliance with the Act." Id. at 320.

1.    **Permanent Injunction**

As to the Government's request for entry of a permanent injunction, there is no basis for this

---

10  By returning the violation areas to their pre-violation conditions through the removal of all unauthorized fill from the protected streams and wetlands at the site and planting new vegetation to restore the pre-violation forested condition.

11  In Weinberger and Amoco Production Co. v. Village of Gambell, Alaska, both cases involving violations of environmental statutes, the Supreme Court reversed the granting of preliminary injunctions that were given without considering irreparable harm or a balance of the equities.

request and such is **DENIED.** A permanent injunction prohibiting Smith from violating the CWA and Section 404 permit requirements (*i.e.*, to permanently enjoin Smith from constructing any further dams, discharging and/or creating impoundments), is superfluous and redundant. Smith, as a matter of federal law, is *already* "so prohibited." In the event Smith violates the CWA and/or Section 404 permit requirements again, that is a matter for another day. Indeed, before the Court could enter such an order, the Government would have to show the likelihood of a *future* CWA violation by Smith. United States v. Sea Bay Dev. Corp., 2007 WL 1378544, *3 (E.D. Va. May 8, 2007); United States v. Fabian, 522 F.Supp.2d 1078, 1094-1095 (N.D. Ind. Mar. 2, 2007). The Government has presented no such evidence. Additionally, implementation of the plan will cure the harm caused by the *prior* actions.

### 2.    <u>Temporary Restorative Injunction (Restoration)</u>

As part of restoring and maintaining the chemical, physical and biological integrity of the Nation's waters, the CWA authorizes the Government to commence a civil action for appropriate relief, including injunctions, for any violation for which it is authorized to issue a compliance order under 33 U.S.C. § 1319(a). Restoration of illegally destroyed wetlands is one type of injunctive relief contemplated by the CWA. 33 U.S.C. § 1319. Courts have recognized a mandatory duty to restore intentionally filled wetlands, unless the equities weigh against restoration. See, e.g.. United States v. Cumberland Farms, 826 F.2d 1151, 1161-1165 (1st Cir. 1987); United States v. Van Leuzen, 816 F. Supp. 1171, 1180 (S.D. Tex. 1993). "Primary guidance for the imposition of the restoration remedy is contained in *U.S. v. Sexton Cove Est., Inc.,* 526 F.2d 1293, 1301 (5th Cir. 1976)." U.S. v. Weisman, 489 F. Supp. 1331, 1342 (M.D. Fla. 1980) (involving the identification of point source equipment used to build a road across a wetland to a private residence).

Courts have held that injunctive relief via a restoration plan must: 1) confer maximum environmental benefits tempered with a touch of equity, 2) be practical and feasible from an environmental and engineering standpoint, and 3) bear an equitable relationship to the degree and kind of wrong the plan is intended to remedy (considers the financial recourses of defendant), and 4) include consideration of a defendant's objections. U.S. v. Bailey, 571 F.3d 791, 805 (8th Cir. 2009); U.S. v.

7

Cundiff, 555 F.3d 200, 216 (6th Cir. 2009); U.S. v. Deaton, 332 F.3d 698, 714 (4th Cir. 2003); *EPA Injunctive Relief Requirements in Section 404 Enforcement Action* at 2 (Sept. 29, 1999), http://water.epa.gov/type/wetlands/outreach/fact15.cfm (last visited July 17, 2014) (citing Cumberland Farms, 826 F.2d at 1164); U.S. v. Sexton Cove Est., Inc., 526 F.2d 1293, 1301 (5th Cir. 1976)); U.S. v. Donovan, 466 F. Supp. 595, 598 (D. Del. 2006); United States v. Robinson, 570 F. Supp. 1157, 1164 (M.D. Fla. 1983); United States v. Weisman, 489 F. Supp. 1331, 1342-1343 (M.D. Fla. 1980).

The CWA grants district courts the authority to order restoration of jurisdictional wetlands that have been unlawfully filled to remedy the harm resulting from the violations. Ogeechee–Canoochee Riverkeeper, Inc. v. T.C. Logging, Inc., 2010 WL 1009797, at *2 n. 2 (S.D. Ga. Mar. 18, 2010); United States v. Donovan, 466 F.Supp.2d 595, 598 (D. Del. 2006).   And courts frequently order restoration of damaged or destroyed wetlands as injunctive relief for violations of wetland permitting requirements. United States v. Deaton, 332 F.3d 698, 714 (4th Cir. 2003); United States v. Cumberland Farms of Conn., Inc., 826 F.2d 1151, 1164–1165 (1st Cir. 1987).   There are two (2) prerequisites to be satisfied before any consideration of the restoration plan itself: 1) the court must have jurisdiction over the portion of the property or activity to be directly affected by the restoration plan, and 2) the court must conduct a hearing in which the merits, demerits, and alternatives to the restoration plan are fully developed.   See, e.g., Weisman, 489 F. Supp. at 1342-1343 (applying the factors).   Once these preliminaries are satisfied, federal courts analyze the 3-4 factors (depending on the court) referenced *supra*.   "The record should establish 'that the court's choice of the specific restoration ordered was based upon a comprehensive evaluation of the environmental factors involved and the practicalities of the situation.'"   Weisman, 489 F. Supp. at 1342-1343 (citing Weiszmann v. Dist. Eng., U.S. Army Corps of Eng., 526 F.2d 1302, 1304 (5th Cir. 1976)).   Further, courts have found restoration orders equitable even when it placed a "heavy burden" on the defendant, because he had no one but himself to blame for the predicament.   Cumberland Farms of Conn., Inc., 826 F.2d at 1165.

As for the prerequisites to a restorative injunction, there is no dispute that this Court has jurisdiction over the affected portions of the site on Smith's property, and moreover, the hearing requirement is satisfied as the restoration plan was part of the Phase II bench trial on remedies.   Having

satisfied these prerequisites, the Court finds that from all the evidence and in keeping with the CWA's goal of "restoring and maintaining the chemical, physical, and biological integrity of the Nation's waters" 33 U.S.C. § 1251(a) -- that entry of a restoration plan and temporary restorative injunction is proper as restoration of the Smith property is necessary and justified.   Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 193 (2000) (federal courts should narrowly frame relief to fit the precise facts of the case).

The Government's expert, Dr. Kruczynski, explained that the trees located within the wetland area of Smith's property drop their leaves forming an organic material known as detritus.   This detritus, if not absorbed within the wetland area, normally would be flushed out into the estuaries and waters through the tidal creek, in combination of natural water movement.   The detrital material, according to testimony, forms the base of the food chain and is relied upon by many aquatic organisms which "man is the ultimate beneficiary."   Weisman, 489 F. Supp at 1345.   The dams/roads fill covered and destroyed acres of wetland vegetation, thereby eliminating this acreage from performing these food chain productions.   Additionally, despite the culverts Smith placed under the fill, the dams/roads impede the flow of water which may carry and distribute detritus.   As stated in Weisman, 489 F. Supp. at 1346-1347 and applicable to the facts of this case:

> The intricate web of interdependence which characterizes our environment requires that we look beyond the present and immediate in assessing the value of any particular element of the environment or in gauging the harm that will accrue from its destruction. Injury to the production and export of detritus from these wetlands, discussed above, is but one example[.] ... Similarly, the new road[s]' interference with the natural flow of water through the area now covered by fill will ultimately change the flushing characteristics of the wetlands... The reduced elevation and flow of water over a period of time will dry out the soil in .. [certain] area[s] .... and convert it to upland. Conversely, the wetland area[s]... may be adversely affected by higher water elevations, again caused by the interference of the new road[s] with the expansion of rising waters in the tidal creeks. These higher water elevations may be too high to sustain emergent wetland vegetation and may eliminate existing species of plants and habitat of animal species... The Court finds that the destruction and alteration of these wetlands has and will detrimentally affect other important environmental characteristics of surrounding wetlands.... These findings of harm effectively foreclose one alternative: the alternative of doing nothing. Clearly some specific remedy is required....

Thus, the Court finds that restoration will confer maximum environmental benefits to the subject site, tempered with a touch of equity.

9

Second, as to practicality, "[t]he question is whether the proposed restoration plan, which theoretically could provide the maximum environmental benefits, is achievable as a practical matter...This calls for consideration of the feasibility and cost-effectiveness of the proposed plan." Weisman, 489 F. Supp. at 1348. In this regard, evidence indicates that the approximate cost of restoration will be $89,000, which the Court finds to be reasonable.

Third, regarding the equitable relation to degree of wrong, "[t]he duty to restore an intentionally filled wetland is mandatory, absent equities." U.S. v. Van Leuzen, 816 F. Supp. 1171, 1180 (S.D. Tex. 1993) (finding that the landowner lacked any equities and, thus, had mandatory duty to completely restore wetland he intentionally had filled, remediate damage caused by lost use of wetland, and take steps to undo damage inflicted upon wetlands permit program by his open and notorious violations of permit requirements of CWA, and by his disregard for cease and desist orders issued by Corps and EPA). The Court must assess whether the proposed restoration is equitable to Smith in light of the degree and kind of wrong it is intended to remedy (looking at for instance, the degree of harm caused and a defendant's financial inability to comply). Intentional conduct on the part of a defendant eviscerates any equitable arguments against restoration. United States v. Pozsgai, 999 F.2d 719, 736 (3rd Cir. 1993) (holding that "repeated noncompliance with the Act and with the Corps' directives to stop filling foreclose any such equitable argument[]"); United States v. Robinson, 570 F. Supp. 1157, 1165 (M.D. Fla. 1983) (assessing a defendant's financial resources and finding defendants' objection that they lacked financial means to accomplish the restoration plan lacked merit). Upon consideration of all the evidence and testimony at trial, the Court finds that the proposed restoration is equitable to Smith.

Fourth, the Court has considered Smith's objections with regard to the specifics of the restoration plan. In part, the Government has agreed (post-trial) with some of Smith's objections and as such, mooted those via filing an amended restoration plan (Doc. 141-1). The Court has addressed the remaining objections in the approved restoration plan.

Accordingly, the Government's request for entry of a temporary restorative injunction against Smith is **GRANTED in part** and the Court **ADOPTS in part** the Government's amended restoration plan (Doc. 141-1) as revised by this Court. (See Attachment A hereto). Moreover, it is **ORDERED**

that the Annual Reports regarding the status of the restoration plan shall be filed with this Court.

## B.     Compensatory Mitigation

Smith opposes the Government's request for compensatory mitigation, and justifiably so based on the wording of the regulations.[12] Specifically, this case primarily concerns an *exemption* to the Section 404 permit requirements, such that there are no permits involved and there is no indication that there will be permits involved in the future.   There has also never been a "mitigation site" designated on Smith's property – an item which is a necessary point of measure/reference for these regulations.   In other words, this is a non-permit case and the compensatory mitigation regulations are simply inapplicable.

As to Dam/road E, Smith conceded that such was not an exempt forest road.   According to the Government, "Dam E does not serve a forestry purpose and cannot be made compliant with the forest road exemption....[so the plan]...proposes...E be fully restored to...pre-violation conditions."   (Doc. 138-1 at 1).   In otherwords, the Government seeks full restoration of Dam/road E, and no permit.   As to the remaining dams/roads, the jury concluded that Dam/road C was an exempt forest road.   The jury found that while they were forest roads, recapture applied to Dams/roads A and B, and the Court concluded that Dam/road D did not meet two (2) of the 15 BMPs even though it was a forest road. According to the Government, "the Proposed Restoration Plan provides for reconfiguration of Dams A, B and D so that they are made eligible for the forest road exemption[.]" (Doc. 138-1 at 1).   Regardless, either party's proposed restoration plan will bring *all* of these violations into compliance with the forest road exemption criteria, such that all of Smith's dams/roads will be fully exempt under Section 404(f)(1)(A) as forest roads – *i.e.*, no Section 404 permit ("after the fact" or otherwise) will be required.

Moreover, the following excerpts from the compensatory mitigation regulations highlight their apparent inapplicability to non-permitted (exempt) scenarios:

---

12 Smith opposes any form of compensatory mitigation as such only applies to permitted scenarios, and because such evidence is inadmissible as no Government expert addressed this relief in their reports and no information as to the specific costs for such was presented to Smith until the eve of trial.   (Doc. 133 at 17-18). Moreover, Smith contends that the Government's request as to temporal losses is improperly based on 12 years of time given that the Government requested a tolling agreement from Smith for five (5) years to resolve the issues, and moreover, only 11 years have passed since 2003.   (Id. at 19).   Smith contends that the five (5) years of required tolling by the Government should not be counted against him.

- The Regulations define a "compensatory mitigation project" as "compensatory mitigation implemented *by the permittee* as a *requirement of a DA permit* (i.e., permittee-responsible mitigation)...." 40 C.F.R. § 230.92 (emphasis added).

- Mitigation bank means a site, or suite of sites, where resources (e.g., wetlands, streams, riparian areas) are restored, established, enhanced, and/or preserved *for the purpose of providing compensatory mitigation for impacts authorized by DA permits.* A mitigation bank sells compensatory mitigation credits *to permittees* whose obligation to provide compensatory mitigation is then transferred to the mitigation bank sponsor..." Id. (emphasis added).

- "Permittee-responsible mitigation means....activity...by *the permittee*...to provide compensatory mitigation for which *the permittee* retains full responsibility." Id. (emphasis added).

- "Temporal loss is the time lag between the loss of aquatic resource functions caused by the *permitted impacts* and the replacement of aquatic resource functions at the compensatory mitigation site. Higher compensation ratios may be required to compensate for temporal loss. When the compensatory mitigation project is initiated prior to, or concurrent with, *the permitted impacts,* the district engineer may determine that compensation for temporal loss is not necessary, unless the resource has a long development time." Id. (emphasis added).

- The Government relies upon the Corps CWA guidelines, 33 C.F.R. § 320.4(r), 40 C.F.R. § 230.10, 55 Fed. Reg. 9210 (Mar. 12, 1990), to discuss the three (3) components of mitigation. However, those "policies shall be applicable to the review of all *applications for DA permits.*" 33 C.F.R. § 320.4 (emphasis added). Subsection (r) provides that mitigation is part of the "review and balancing process on...*permit applications[]*" adding that consideration of mitigation occurs as part of "*the permit application review process*[.]" 33 C.F.R. § 320.4(r) (emphasis added). Part 230.10 references compliance with the guidelines' requirements in order to receive a permit, addressing what discharge of dredged or fill material shall be permitted.

- Similarly, the <u>Federal Regulations</u> 55 Fed. Reg. 9210 (Mar. 12, 1990) provide, in part, as follows:

  > ...The agencies developed the MOA in response to questions that had arisen with respect to mitigation requirements under the Guidelines *applicable* to the review of *applications for* standard Section 404 *permits*....we anticipate that the MOA will increase the effectiveness of the Section 404 program by reducing delays in *permit processing,* minimizing ambiguity in the regulatory program and by providing agency field personnel with a clearer understanding of the procedures for determining appropriate and practicable mitigation under the Guidelines...The MOA interprets and provides internal guidance and procedures ... for implementing existing Section 404 *permit* regulations....The MOA also maintains the flexibility of the Guidelines by expressly recognizing that no net loss of wetlands functions and values may not be achieved *in each and every permit action*......The Guidelines establish environmental criteria which must be met for activities to be *permitted* under Section 404......The Guidelines are the environmental standard for Section 404 *permit* issuance under the CWA....*Mitigation requirements shall be conditions of standard Section 404 permits*....This MOA shall take effect on February 7, 1990, and will *apply* to those completed standard *permit applications* which are received on or after that date.

12

- 33 C.F.R. § 332.3(b) concerns requirements for mitigation DA permits (permitees).

- 40 C.F.R. § 230.93(b) concerns compensatory mitigation to offset environmental losses resulting from unavoidable impacts to waters of the United States "authorized by DA permits[]" and discusses mitigation requirements for permitted scenarios.

- The temporal loss statute is concerned with mitigation for DA permit applications (i.e., those situations where a DA permit has been issued (or in the process of being issued).

- The stated purpose of this portion of the CFR is to establish standards and criteria for the use of all types of compensatory mitigation and in-lieu fee mitigation to offset unavoidable impacts to US waters authorized through the issuance of DA permits under Section 404. 33 C.F.R. §332.1(a).

- The general compensatory mitigation requirements discusses the existence of a DA permit. 33 C.F.R. § 332.3.

- Section 332.1(b) provides: (b) Applicability. This part does not alter the regulations at § 320.4(r) of this title, which address the *general mitigation requirements for DA permits…*

Despite the Government's assertion that an award of temporal losses in this case is "consistent with federal regulations" "[u]nder the plain language of the statute" (Doc. 137 at 6-7), such is not the case as the regulations only concern *permitted* situations.[13]

Further, the Court has been unable to find a single case where compensatory mitigation was awarded when no permits were involved and an exemption applied. And while given the opportunity to do so, the Government failed to provide the Court with any case law showing compensatory mitigation awarded as a remedy without a permit and with an exemption. Instead, the cases relied upon and cited by the Government, to assert that the compensatory mitigation law (mitigation banks and/or temporal loss) applies here, actually deal with distinguishable *permitting* situations.[14]

---

13 Further, the Government asserts that this Court has the broad equitable authority to require compensatory mitigation for any permanent impacts to the Nation's waters, including any part of a protected stream or wetlands that cannot be fully restored due to a CWA violation. However, this ignores the very wording of the permitting regulations – that they are regulations and forms of relief which apply to *permitted* scenarios. The Court has neither the type or scope of equitable relief characterized by the Government, nor can it unilaterally rewrite the regulations so they apply to non-permitted situations.

14 The Government relies upon Ohio Valley Environ. Coalition v. Aracoma Coal Co., 556 F.3d 177, 204-205 (W. Va. 2009); however, that case dealt with challenges to the issuance of four (4) permits allowing the

Under the unique circumstances of this case[15] and given the other forms of relief available to the Government to remedy Smith's CWA violations, the undersigned is not inclined to grant a form of relief when no basis for same has been provided. Even if the Court had the authority it would decline to require compensatory mitigation because the restoration and monetary penalties imposed adequately address the violations. As such, the Government's request for compensatory mitigation is **DENIED**.

## C.     Civil Penalties

Before substantively addressing civil penalties, the Government's requested amount should be viewed in context of *how* it has litigated this potential remedy. This case was filed in August of 2012.

---

filling of West Virginia stream waters in conjunction with area surface coal mining operations. See also Butte Envtl. Council v. United States Army Corps of Eng'rs, 620 F.3d 936, 947 (9th Cir. 2010) (dealt with issuance of a permit by the Corps); United States of America v. Feinstein Family P'p et al., Civil Action 98-873 (M.D. Fla. Oct. 30, 1998) (concerning the activities of a permit applicant, and referencing 40 C.F.R. § 1508.20 to note that mitigation "comes into play at the permitting stage of development, where it may be a condition imposed" by the Corps or EPA); Ogeechee-Canoochee Riverkeeper, Inc. v. T.C. Logging, Inc., 2010 WL 1009797 (S.D. Ga. 2010) (where an "after the fact" permit was obtained from the Corps). The same holds true to the cases provided by the Government as exhibits (Docs. 137-1 through 137-4) ((Staben Consent Decree concerned National Permit #32 and required the party to obtain all necessary permits and submit to the EPA a permit status checklist), (Century Homebuilders dealt with a permit to authorize discharges), (Newdunn Associates dealt with Nationwide Permit #32 and did not relieve defendants of the obligation to comply with any applicable permit requirements), and (Chesapeake Appalachia dealt with Nationwide Permit #32 and did not relieve defendants of the obligation to comply with any applicable permit requirements and required defendants to obtain all necessary permits and apply for certain specific permits as part of the compliance protocol of the consent decree)).

15 Including the Government's untimely presentation of information (hard facts and specific calculations) concerning temporal loss to Smith – namely, occurring on the eve of trial. While the Government contends that Smith knew it would seek temporal losses because it sought such relief in the Complaint and other pre-trial filings (Doc. 137 at 5 at note 1 (referencing specifically Doc. 122)), this is not tantamount to placing Smith on notice of a specific request for temporal loss as a form of relief. The Government cannot claim compensatory mitigation is injunctive relief and so no specific calculations or numbers as to Smith's potential temporal loss costs were required to be produced to Smith, yet simultaneously hold Smith to some "understanding" that the Government was seeking temporal loss with a specific price tag and as such had to "just accept" the numbers it presented for the first time at trial.

Moreover, pointing to *pre-litigation* correspondence and documents given to Smith (Doc. 122 at 2-3 and at note 2), before any Complaint was filed, to somehow assert that Smith was "on notice" that temporal losses would officially be sought against him in this case lacks merit. What parties demand and assert pre-trial is often distinct to what is actually litigated and the forms of relief officially sought throughout the course of any case. As for the Harris report the Government asserts it served on Smith in July 2013, which mentioned that Smith, in Harris' opinion, has the financial capability to purchase mitigation credits, again, that has nothing to do with the official relief the Government sought against Smith. For the Government to contend that based on that report Smith was "undoubtedly on notice of the magnitude" of the Government's compensatory mitigation claim (including temporal loss component) is a non-starter. The Harris report did not break down any temporal losses, but instead, provided an overall amount as to what Smith could pay, in his opinion, for *everything*.

Throughout this case, the Government failed to notify either Smith or this Court of the actual amount of civil penalties sought for the CWA violations. At most, the Government only (*inadvertently*) disclosed and presented such evidence during discovery -- via the deposition testimony of EPA representative Mike Wylie -- for a potential civil penalty range of $50,000-$150,000. (Doc. 110; Doc. 110-2 at 3 (Dep. Wiley at 149-150)). However, the Government would not -- and did not even at trial -- commit to *that* penalty range. Additionally, in the Government's May 13, 2014 jointly filed proposed pretrial document for the Phase II trial, the Government failed to specify the total civil penalties sought (Doc. 107 at 5-7) and instead, generally discussed civil penalties for CWA Section 404 violations and simply stated that per statute "[f]or violations occurring after January 30, 1997, the maximum penalty is $27,500 per day." (Id. at 6). As such, on May 15, 2014, the Court ordered the Government to file a Supplement to the proposed pretrial document specifying the damages sought against Smith (and also, as discussed at the Final Pretrial Conference to explain how it arrived at that figure). (Doc. 109 at 2).

In its May 19, 2014 Supplement, the Government stated that it sought to recover $300,000 as civil penalties (Doc. 113 at 2) with the contingency and caveat that the Court also order, *in full*, all of the injunctive and compensatory mitigation relief requested; otherwise, the Government stated that it would seek an even higher penalty. In so doing, the Government provided no information as to how they calculated the $300,000 total, much less any discussion of the requisite CWA penalty factors used in the Eleventh Circuit to arrive at a penalty amount. (Doc. 113). Instead, two (2) weeks before trial was the *first* time either the Court or Smith were notified of *any* civil penalty total which would be sought by the Government. Nevertheless, even then, still, neither the Court nor Smith had been provided any explanation as to *how* the Government arrived at that amount. This Court was then, and remained through the start of Phase II trial on June 2, 2014, wholly unable to discern whether the $300,000 figure was proper and/or how it related to any of the facts of this case. Further complicating both the Court and Smith's understanding of the civil penalties sought, is that on the first day of the Phase II trial on June 2, 2014, the Government asserted – *for the first time and without explanation or evidence as to how that*

*number was calculated* – that it seeks **$1,500,000** as the civil penalty, *a figure five (5) times that demanded just a few weeks earlier*. With the aforementioned context in mind, the Court turns to substantively addressing the matter of civil penalties.

To protect the integrity of the Nation's waters, Congress authorizes courts to, upon finding a violation of the CWA, assess appropriate civil penalties under Section 309(d) to restore and maintain the "chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). 33 U.S.C. § 1319(b), (d) (providing for civil penalties); <u>Atlantic States Legal Foundation Inc. v. Universal Tool & Stamping Co, Inc.</u>, 786 F. Supp. 743, 746 (N.D. Ind. 1992) (providing that a district court is authorized to assess appropriate civil penalties). However: "[t]he Court can conceive of no mathematical formula which can be applied to the overall effort of assessing a fair penalty. Each case must be decided on its own facts. While the experts offered calculations on the ability to pay as well as the economic benefit, to these findings there must be applied a degree of reason and common sense without the benefit of precise mathematical equations...To achieve the goal of deterrence, a penalty must be high enough so that the discharger cannot "write it off" as an acceptable environmental trade-off for doing business... [it] must be high enough to insure that [violators]...cannot simply absorb the penalty as a cost of doing business." <u>United States v. Gulf Park Water Co., Inc.</u>, 14 F. Supp. 2d 854, 868-869 (S.D. Miss. 1998).

Section 309(d) mandates a civil penalty for each violation, instructing that any person found in violation of the Act "shall be subject to a civil penalty not to exceed $25,000 per day. 33 U.S.C. § 1319(d). Over the years, this amount has been amended and supplemented by the <u>Code of Federal Regulations</u> as follows: January 30, 1997 - March 15, 2004, the penalty is $27,500 per day per violation, March 15, 2004 - January 12, 2009, the penalty is $32,500 per day per violation; January 12, 2009 - December 6, 2013, and effective after December 6, 2013, the penalty is $37,500 per day per violation. 40 C.F.R. § 19.4 (Eff. Dec. 6, 2013). Congress has also specified that penalties be assessed considering the maximum daily amount "for each violation." <u>Atlantic States Legal Foundation, Inc. v. Tyson Foods, Inc.</u>, 897 F.2d 1128, 1139 (11th Cir. 1990). In calculating the appropriate civil penalty, the Eleventh

16

Circuit has adopted a "top down" approach: the court must first determine the maximum fine for each daily violation for which a defendant is liable, but thereafter can can use the CWA's enumerated factors to uphold or mitigate the maximum.   33 U.S.C. § 1319(d); Tyson Foods, 897 F.2d at 1141.

To arrive at the maximum starting figure, there must be a beginning and end date to the "violation time clock."[16]   In this case, there is no clear indication as to the actual day that the unpermitted work began.[17]   Given that the statute instructs that civil penalties be assessed per day and the Government has provided no facts in Phase II of the trial as to the start date, the Court has selected January 1st of each relevant year as the "start date" from which to calculate the maximum per day penalty.   Similarly, as the Government has not provided any facts as to when the clock for Smith's civil penalties stopped, the Court has found persuasive caselaw concerning ongoing impediment violations.[18]   From this, the Court finds

---

16 The start date for assessing penalties has traditionally been the date that violations of the CWA began. See, e.g., Ogeechee-Canoochee Riverkeeper, Inc. v. T.C. Logging, Inc., 2010 WL 1009797 (S.D. Ga. Mar. 18, 2010) (starting the penalty clock as of the day the unpermitted road construction began); Center for Biological Diversity v. Marina Point Dev. Assocs., 434 F. Supp. 2d 789 (C.D. Cal. 2006) (starting the penalty clock as of the day that unpermitted work began); United States v. Gulf Park Water Co., Inc., 14 F. Supp. 2d 854 (S.D. Miss. 1998) (starting the penalty clock as of the day the chancery court issued a cease of the illegal discharge and discharge continued).

17 The Complaint indicates work on the dams/roads and subsequent discharge began on or around 1998. (Doc. 1).   The summary judgment offers a little more precision on the year but no specific date: stating work began on Dams A, B, and D in 2003 or 2004, and work began on Dam E in 2004 or 2005.   (Docs. 51, 106).

18 See e.g., T.C. Logging, 2010 WL 1009797, *1 (dealing with a road constructed in violation of the Act that was in place at the time of the remedies hearing); United States v. Donovan, 466 F. Supp. 2d 595, 597 (D. Del. 2006) (dealing with a landowner whose unpermitted fill of wetlands was in place at the time the remedies hearing was held). Additionally, while concerned with unpermitted discharge of water from an industrial plant, Sierra Club, Lone Star Chapter v. Cedar Point Oil Co., Inc., 73 F.3d 546 (5th Cir. 1996) sheds light on a date that can be used to stop the civil penalty clock.   In Cedar Point, the parties stipulated at trial that there were 797 days of unpermitted discharge.   Id. at 573.   The district court entered its judgment 12 days later; the unpermitted violations of the Act were presumed ongoing from time the parties stipulated 797 days to the time the court announced its judgment.   Id. The circuit court noted that the district court added the 12 days to the maximum civil penalty multiplier, which brought the total multiplier to 809 days.   Id.   The circuit court agreed with the district courts calculation of the maximum penalty based on 809 total days.   Id.   However, United States v. Donovan illustrates the common uncertainty in calculating the maximum civil penalties when the parties do not stipulate to an end date for CWA violations.   In Donovan, the Government filed a complaint against the defendant for unpermitted fill in a protected wetland and sought injunctive relief in 1996.   Donovan, 466 F. Supp. 2d at 597.   It was contended that the defendant began filling protected wetlands in violation of the CWA in February 1993.   Id.   In 2006, the court granted the Government's request for summary judgment and assessed civil penalties in the amount of $256,000. Id. at 600.   The court opined that the maximum civil penalty under 1319(d) ranged from $11 to $15 million.   Id. The court did not elaborate on the end date used to derive this figure.   It can be inferred that the civil penalty clock had to stop on the date the summary judgment and civil penalty were jointly announced.

that the harm from Dams A, B, D, and E were ongoing through Phase II's conclusion and will thus stop the clock on the final day of the Phase II trial – June 3, 2014 -- because Phase II concludes or decides all of the issues raised in the Government's Complaint.

As noted *supra*, in calculating the appropriate CWA civil penalty, this Court is required to start with the maximum. Based on the foregoing, Smith is *subject* to a maximum CWA penalty in the amount of **$561,662,500** for **16,323 days** of violations.[19] However, in the Eleventh Circuit, the maximum potential CWA penalty is merely a *starting* point. From this, the Court conducts a top-down approach in light of the six (6) Section 1319(d) factors, assessing the propriety of the maximum CWA penalty available – to either maintain or deviate from the maximum. 33 U.S.C. § 1319(d); Tyson Foods, 897 F.2d at 1440-1441; Sierra Club, Lone Star Chapter v. Cedar Point Oil Co., Inc., 73 F.3d 546, 574-576 (5th Cir. 1996); Public Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals, Inc., 913 F.2d 64, 80 (3rd Cir. 1990); Universal Tool, 786 F. Supp. at 746-747.

Specifically, because Congress set a particularly high maximum for civil penalties to reinforce the deterrent and punitive nature of the CWA, after calculating the maximum, courts may, and often do, adjust significantly downward based on mitigating factors listed in the statute. Cedar Point, 73 F.3d at 573; Tyson Foods, 897 F.2d at 1142. These factors consist of: 1) the seriousness of the violation or violations; 2) the economic benefit (if any) resulting from the violation; 3) any history of such violations; 4) any good-faith efforts to comply with the applicable requirements; 5) the economic impact of the penalty on the violator; and 6) such other matters as justice may require. 33 U.S.C. § 1319(d); Tyson Foods, 897 F.2d at 1140. Courts may also consider any other factors they determine are important to imposing a *fair* penalty. Tyson Foods, 897 F.2d at 1141. A court's decision is given a great deal of discretion in assessing the civil penalty under the six (6) factors. Tull v. United States, 481 U.S. 412,

---

19 This total is based on days calculated from the representations in summary judgment that work began on Dams A, B and D in 2003 or 2004 and on Dam E in 2004 or 2005 (Docs. 51, 106), with January 1st of each year. Additionally, this total includes the changing amounts of the per day per violation penalties, per the Code of Federal Regulations amendments and supplements for the applicable time periods.

427 (1987). However, each factor should be discussed as to what, if any, effect it has on the final penalty assessed. Tyson Foods, 897 F.2d at 1141. In so doing, the Court finds as follows.

### 1. Seriousness of Violations

The seriousness of the violation deals with the negative impact a defendant's actions have on the environment. United States v. Smithfield Foods, Inc., 972 F. Supp. 338, 344-346 (E.D. Va. 1997) (considering the negative impact that the defendant's chlorine and cyanide discharge had on native species). This can range from toxic waste to organic material being discharged without a permit into protected wetlands. Id. See also e.g., Weber v. Trinity Meadows Raceway, Inc., 1996 WL 477049, *16 (N.D. Tex. Jun. 20, 1996) (evaluating whether the defendant's unpermitted discharge of pollutants which were "largely, if not, wholly comprised of organic material" mitigated the civil penalty). The seriousness of the violations is determined after both parties offer evidence in the form of facts or expert testimony. Smithfield, 972 F. Supp. at 343-349; Gulf Park Water, 14 F. Supp. 2d at 859-862. The seriousness can be mitigated if the environmental impact of the unpermitted action only affects the immediate area. T.C. Logging, 2010 WL 1009797, *4. Additionally, factors to consider include the number and frequency of violations, how far the violator's discharges exceed the permit parameters, the presence, delay, or absence of state enforcement, the toxicity of the discharged substance, and violations of reporting requirements. Smithfield, 972 F. Supp. at 343; Allegheny Ludlum, 187 F. Supp. 2d at 426; Hawaii's Thousand Friends v. City & County of Honolulu, 821 F. Supp. 1368, 1383 (D. Haw. 1993) (looking to the number of violations, the duration of noncompliance, the significance of the violation, and the actual or potential harm to human health and the environment).

The Government contends that the seriousness of the violation is high and supports a substantial penalty. In support, Dr. Kruczynski testified that water testing indicates a rise in temperature in the streams surrounding the impoundments, which affect water quality. Dr. Kruczynski also emphasized the seriousness of the destruction of wetlands in general. There was no evidence presented at trial that EPA conducted any water quality testing. In contrast, Smith hired Dr. Vittor to evaluate the water quality

19

over a period of four (4) years to determine any detrimental effects of the crossings. This testing was commenced at the request of the EPA and was paid for by Smith at a cost of $35,000. Dr. Vittor responded that while the water temperature has risen, there has been no material effect on the water quality. Dr. Vittor also noted a reduction in suspended solids which improves water quality.

The Court is more inclined to rely on the expert who actually conducted the testing for his opinion regarding the detrimental effects of the violation on the water quality at this time. Thus, the Court finds that the violations have not resulted in significant effects on water quality. However, there have been significant areas of wetlands that have been destroyed through Smith's building of the roads/dams and from the impoundments that resulted. The Court credits Dr. Kruczynski's testimony in this regard and finds that the *cumulative* effect of this destruction is significant to the environment.

The primary purpose to be served in the imposition of a civil fine is to deter any future destruction of wetlands. Still, there has been no evidence of harm (or even potential harm) to human life, nor any specific evidence of harm to animal or aquatic life. The violations in this case are not toxic dumping, but rather timber roads built by an individual who appears to care about his property and its natural resources. With modifications the timber roads, which form the bases for the majority of the violations, become CWA exempt. Thus, this factor does not support the severity of a maximum fine and instead supports a significant decrease.

### 2. Economic Benefit

The second factor to be considered is the economic benefit that a defendant receives from his unpermitted actions. 33 U.S.C. § 1319(d). This factor "is of key importance if the penalties are to successfully deter violations." Tyson Foods, 897 F.2d at 1141. "A court need only make a 'reasonable approximation' of the economic benefit [reaped from the defendant's noncompliance] when calculating a penalty under the [CWA]." Cedar Point, 73 F.3d at 576. See also e.g., Piney Run, 82 F. Supp. 2d at 470; Alleghey Ludlum, 187 F. Supp. 2d at 437; Gulf Park Water Co., 14 F. Supp. 2d at 863. The goal of the economic benefit analysis is to prevent a violator from profiting from its wrongdoing. Piney Run, 82

20

F. Supp.2d at 471.

Initially, it was the theory of the Government that Smith built these roads to support his hunting lodge enterprise. However, the Government put forth no evidence of any economic benefit that has been derived from the Dennis Wing Lake Club, a quail hunting operation. In the liability phase of the trial, Smith credibly testified that the Club was basically a break-even proposition. There was some evidence that the crossings had resulted in some timber cutting income, but this was relatively minor and intermittent. Moreover, any economic benefit from timber cutting should likely be exempt from consideration since the CWA itself exempts what would otherwise be violations if the crossings were built within guidelines for forestry purposes. Thus, there is insufficient evidence of economic benefit to Smith for his CWA violations. As such, this factor does not support a severe civil penalty.

### 3. <u>Violations History</u>

The third factor to consider is the defendant's history of violations. 33 U.S.C. § 1319(d); <u>Smithfield Foods</u>, 191 F.3d at 531; <u>Allegheny Ludlum</u>, 187 F. Supp. 2d at 433. The absence of any past state or federal environmental law or regulation violations can help mitigate the maximum civil penalty assessed under § 1319(d). <u>T.C. Logging</u>, 2010 WL 1009797, *4 (reasoning that the lack of history helped justify a reduction in the civil penalty paid). A defendant's repeated violations or an ongoing history of a particular violation that spans a significant duration can justify upholding a higher penalty. <u>Gulf Park Water</u>, 14 F. Supp. 2d at 864 (reasoning that the defendant was not entitled mitigation under this factor because violations were ongoing for twelve years and there were repeated attempts to bring him into compliance); <u>Smithfield</u>, 972 F. Supp. at 349 (stating that the six years of ongoing violations was a significant duration taken into consideration with prior violations). Whether a defendant has committed similar violations in the past is not the only part of the court's analysis, as the duration of a defendant's current violations are also considered. <u>Smithfield Foods</u>, 972 F. Supp. at 349. For example, where "defendant's violations occurred daily and uninterrupted for over twelve (12) years," one court found that

"the discharge is serious solely by virtue of its duration." Gulf Park Water, 14 F. Supp. 2d at 859.

There is no past history of violations by Smith, thus, that part of this factor does not support a severe civil penalty but instead, supports a significant decrease from the maximum. Even so, Smith's current violations are lengthy in duration and continue to the present day – based on the Government's representations, approximately 12 years. However, Smith contends that for five (5) of those years, the Government required he "do nothing." On balance, this factor weighs in favor of a penalty amount that will sufficiently deter individuals (including Smith) from violating the CWA in the future. However, this factor certainly does not justify the absurd amount of over $500,000,000.

### 4. Good Faith Compliance Efforts

The fourth factor to be considered is the good-faith efforts of the defendant to comply with the requirements of the Act. 33 U.S.C. § 1319(d). This can be summed up as analyzing the defendant's interaction with regulatory agencies before a civil complaint is filed. Cf. T.C. Logging, 2010 WL 1009797, *4, with United States v. Key West Towers, Inc., 720 F. Supp. 963 (S.D. Fla. 1989).[20] Additionally, courts look to whether a defendant took any actions to decrease the number of violations or made efforts to mitigate the impact of their violations on the environment. Smithfield, 972 F. Supp. at 347-349. Evidence of good faith efforts may include proof of insufficient or inadequate efforts to comply, conducting environmental compliance audits, hiring consultants, or similar endeavors to obey permitting requirements. Id.; Gulf Park, 14 F. Supp. 2d at 864-866.

The "good faith" factor was the subject of great controversy between the Government and Smith, and also involves the matter of credibility. The Government contends that this factor supports a

---

20 In T.C. Logging, the defendant worked with the Corps to obtain an after-the-fact permit, which would evaluate the harm of the unpermitted road and prescribe the necessary action to bring it into compliance. Id. at *1. The district court found that the defendant's engagement with the Corp satisfied the good-faith factor. Id. at *4. T.C. Logging can be contrasted with Key West Towers. In Key West Towers, the court found it "especially bothersome" that the defendant continued to place unpermitted fill in a protected wetland after receiving a cease and desist order from the Corps. 720 F. Supp. at 966. The court noted that the defendant's after-the-fact permit application was deactivated because of inaccuracies. Id. The court held that these two factors, along with a finding of liability from the jury, weighed in favor of imposing a $250,000 civil penalty. Id.

significant civil penalty -- primarily based on the fact that it has taken 12 years to resolve this dispute and it has been 8 years since the EPA issued its citation.

Mike Wylie, the EPA's representative, seemed to find unbelievable that Smith would not agree to the EPA's determination that his roads were not exempt. Wylie also appeared to find equally incredulous the fact that Smith litigated the matter, rather than just accepting the EPA's interpretation. Wylie characterized Smith's difference of opinion on the law (including whether exemptions applied) as a failure to cooperate. Wylie also seemed to suggest that it was an insult to the EPA's authority that Smith attempted to rectify the objection to dam/road D (by installing a culvert) without first obtaining EPA's stamp of approval and that it should weigh against Smith as to culpability.

In contrast, Smith, through the testimony of Dr. Vittor, contends that he was cooperative with the EPA and attempted in good faith to comply with the applicable regulations. As evidence of Smith's good faith, Dr. Vittor points to the fact that at the EPA's request, Smith hired an expert to test the water quality over a four (4) year period at a cost to Smith of $35,000, and hired a geotechnical engineer to evaluate the crossings at a further cost to Smith of $55,000. Dr. Vittor also testified that Smith paid him to attempt to discuss and reach an agreement with the EPA. Moreover, the record is replete with references to amicable site visits by the EPA, Corps of Engineers, and DOJ attorneys and staff.

The Court does not find that Smith's dealings with the EPA support a severe civil penalty. Rather, considering the evidence and the jury's findings, Smith was partially vindicated in his resistance to the EPA's determinations. Accordingly, the Court finds that Smith's belief that he was in compliance was not only reasonable, but partially correct. Piney Run, 82 F. Supp. 2d at 471 (finding good faith efforts at compliance when defendant did not consider the discharges to be permit violations and the court found that the interpretation was not unreasonable). Further, Smith has spent a significant amount of money at the request of the EPA for testing. This does not indicate a person who simply ignored EPA over a 12 year period and made no efforts to comply with CWA requirements.

5. **Economic Impact of Penalty on the Violator (Undue Burden)**

The fifth factor is the economic impact that a civil penalty would have on the defendant violator (*i.e.*, Smith's financial stability). 33 U.S.C. § 1319(d); Universal Tool, 786 F. Supp. at 753-754. Hearing testimony from a certified public accountant, a representative of the defendant corporation, or a special master's report generally assesses the economic impact a civil penalty will have on defendant. Gulf Park Water, 14 F. Supp. 2d at 866-868 (hearing expert testimony and reviewing a special master's report);[21] United States v. Avatar Holdings, Inc., 1996 WL 479533, *11 (M.D. Fla. Aug. 20, 1996) (hearing testimony from a representative of the defendant corporation). But if a defendant seeks to use the economic impact of a civil penalty to mitigate the total amount, he has the burden of showing that the penalty would be ruinous or otherwise disabling. Gulf Park Water, 14 F. Supp. 2d at 868. Additionally, if a court is convinced that the imposition of the maximum penalty would have a more drastic effect on a defendant than is needed to ensure future compliance, the court may take that into account. Weber, 1996 WL 477049, *17.

The Government has proposed that Smith should be required to pay $1.5 million for restoration, fines, temporal loss and mitigation. This would amount to 79% of his and his wife's liquid assets. (Plf's Phase II Trial Ex. 230). And although Smith is 63 years old, retired, depends on the vulnerability of the market for income, and neither he nor his wife have significant earned income, the Government contends that the "remainder" will be "adequate" for his needs for the rest of his and his wife's lives. It is the undersigned's opinion that the Government's request lacks objective perspective on the seriousness of this particular violation. To suggest that the Court penalize Smith to this extent merits no further

---

21 After hearing evidence from experts, at least one court has allowed the personal and corporate assets of the defendant that are illiquid to be used in calculating a defendant's ability to pay a civil penalty. Gulf Park Water, 14 F. Supp. 2d at 866-68. In Gulf Park Water, the district court adopted Government's expert opinion that evaluated the "assets, less liabilities, which could be liquidated or sold to gain revenue for a penalty payment." Id. at 866. The assets considered included personally owned stock, art, and guns of one defendant and the operating and non-operating assets of another defendant, which was a corporation. Id. The court ordered a civil penalty totaling $1,500,000 based on the expert's opinion of the after tax value of the assets after liquidation.

discussion.

6.     **Other matters as justice may require**

The final factor allows the court to address such other matters as justice requires, or essentially any other facts deemed relevant.   Smithfield Foods, 972 F. Supp. at 353.   This factor has been used as a tool to determine whether the civil penalty was equitable in relation to other analogous cases.   United States v. Righter, 2010 WL 4977046, *4 (M.D. Pa. Dec. 2, 2010) (performing a side-by-side comparison of two prior cases to fashion an equitable penalty).   Additionally, a defendant may be "entitled to some credit for their lack of bad faith."   Allegheny Ludlum, 187 F. Supp. 2d at 445.

Smith has been *(partially)* found by a jury to be a CWA Section 404 violator.   Smith flooded wetlands on his property and created significant impoundments.   This is not a case of toxic dumping, pollution, or egregious or irreversible harm to the environment (in the sense that restoration is available). Rather, this is a case of a retired banker from a small town in South Alabama who decided to -- albeit very unwisely -- build roads/dams on family property for the family's forestry business.   Smith believed that the roads were forest roads and so were exempt from the CWA's Section 404 permit requirements. While he was ultimately wrong, in part, to some extent the jury also agreed with him.

Moreover, the fact that Smith disputed the EPA's findings is certainly not held against him. While the Government has repeatedly expressed its surprise and shock at having to initiate this litigation (they asserted at trial that the Section 404 permit violations cases settle about 99% of the time such that this was abnormal), that does not detract from a United States citizen's right to dispute the Government's findings and defend the claims against him.   In sum, Smith is entitled to some credit for his lack of bad faith (the absence of "evil motive"), and because the environmental harm which resulted from his violations can, and will, be remedied and restoration will occur on his property.

Further, the Court has considered the expense to Smith to implement the requisite restoration plan.   The demolition cost will entail the extraction and movement of a significant amount of fill material.   Additionally, Smith will bear further restoration costs for the destruction of Impoundment E

25

(the lake), planting trees throughout his property, and taking all of the other detailed restoration steps required by the forthcoming temporary restorative injunction (amended restoration plan). Also, Smith will be required to pay the fees of the Court appointed consultant.

### 7. EPA Section 404 Settlement Penalty Policy Considerations

It is the EPA's policy to accomplish certain objectives in the assessment of penalties for Section 404 permit violations: 1) penalties should be large enough to deter noncompliance, both by the violator and others similarly situated; 2) penalties should help ensure a level playing field by making certain that violators do not obtain an economic advantage over others who have complied in a timely fashion; 3) penalties should generally be consistent across the country to promote fair and equitable treatment of the regulated community; and 4) settlement penalties should be based on a fair and logical calculation methodology to promote expeditious resolution *EPA Revised Clean Water Act Section 404 Settlement Penalty Policy* at 4 (Dec. 21, 2001), http://water.epa.gov/type/wetlands/outreach/fact15.cfm (last visited July 17, 2014). Courts may balance any penalty against the violator's ability to survive after it imposes a fine, considering a defendant's total assess and liabilities, etc. Smithfield Foods, 972 F. Supp. at 353; Gulf Park, 14 F. Supp. 2d at 866-868.

To assist with the calculation of civil penalties in this case, the Court has referred to the EPA's settlement policy and penalty assessment process, including the testimony of EPA representative Mike Wylie about same. While the Court understands that the EPA policy is used for settlement purposes, given the sparse case law, it proves as a useful guide. The EPA policy provides that the "bottom line penalty" amount (the minimum penalty the government will accept) is comprised of economic benefit plus a preliminary gravity amount (plus or minus gravity adjustment factors) minus litigation considerations, minus ability to pay, minus mitigation credits via the following formula:

Penalty = Economic Benefit + (Preliminary Gravity Amount +/- Gravity Adjustment Factors) - Litigation Considerations - Ability to Pay - Mitigation Credit for SEPs

Preliminary Gravity Amount = (sum of A factors + sum of B factors) x M

M is the Multiplier = $500 for minor violations with low overall environmental and compliance significance, $1,500 for violations with moderate overall environmental and compliance significance, and $3,000-$10,000 for major violations with a high degree of either environmental or compliance significance.

As to economic benefit, the Government presented no relevant economic benefit evidence, as such, the Court finds that this factor is zero (0).[22]

Regarding gravity, at trial the Court questioned EPA representative Mike Wylie as to these factors (which are based on a scale of 1-20, with 1 as the lowest and 20 as the highest), and has considered, in part, his testimony concerning the values he would ascribe but acknowledges areas of disagreement, to find as follows:

"A" Factors: Environmental Significance
| | |
|---|---|
| Harm to Human Health or Welfare: | 1 (low per Wylie) |
| Extent of Aquatic Environment Impacted: | 10 (but per Wylie it is 15) |
| Severity of Impacts to Aquatic Environment: | 10 |
| Uniqueness/Sensitivity of Affected Resource: | 1 (low per Wylie) |
| Secondary/Off- site impacts: | 5 (but per Wylie it is 11-13)[23] |
| Duration of Violation: | 10[24] |

+

"B" Factors: Compliance Significance
| | |
|---|---|
| Degree of Culpability: | 5 (but per Wylie it is 10-15)[25] |
| Compliance History of Violator: | 0 (none per Wylie) |
| Need for Deterrence: | 10 |

---

22 Indeed, the only evidence presented during trial was that of timber sales on the site. (Gov't Phase II Tr. Ex. 44). However, Smith contends that the dams/roads were "forest roads" such that they were constructed for his timber business. Additionally, while Smith also operates a quail hunting club on the site (Dennis Wing Lake Club), the Government failed to present any evidence of his sales or profit from that business.

23 There was no evidence to support the higher rating as the only evidence presented was that of some elevated water temperatures.

24 The Government contends that Smith's violations have been occurring for 12 years.

25 The Court disagrees with the Government's description of Smith's culpability and its characterizations of his behavior and interactions with the Government. Additionally, the Court is not persuaded by the Government's contention that the mere fact of Smith disputing the Government's findings and disagreeing with same, and as a result taking this matter to court, somehow translates into grounds for a high culpability score, because the Government had to expend resources and money to litigate this case. Under the law, Smith was entitled to dispute and disagree with the Government's findings and litigate this matter; thus, Smith's exercise of his legal rights should not be equated as "culpability" or "avoidance" or any other negative behavior.

27

Gravity: 52

Additionally, the Court finds that Smith's violations are of "moderate overall environmental and compliance significance" such that the applicable Multiplier (M) is $1,500. As such, the Preliminary Gravity Amount is 52 x $1,500 = $78,000. The Penalty is calculated as follows:

| | |
|---|---|
| Penalty = Economic Benefit | 0 |
| + Preliminary Gravity Amount | $78,000 |
| - Adjustments/reductions[26] | 0 |
| | $78,000 |

### 8.  Conclusions as to Civil Penalty

As stated *supra*, Smith is *subject* to a maximum CWA penalty in the amount of $561,662,500 for 16,323 days of violations. Additionally, in this Court's opinion, under the EPA Section 404 Settlement Policy, Smith would be subject to a $78,000 penalty if he settled. This presents a wildly varying range.

The Court's research reveals a dearth of cases dealing with dam and impoundment situations matching that here. As such, the Court has reviewed a handful of persuasive cases that have dealt with an unpermitted[27] road or wetland filling, and what they have held to be appropriate civil penalties:

- T.C. Logging, 2010 WL 1009797, *5 (assessing a $78,000 penalty for one road);

- Donovan, 466 F. Supp. 2d at 599 (assessing a $256,000 penalty for .771 acres of illegal fill);

- Weisman, 489 F. Supp. at 1350 (assessing a $10,000 penalty for one road along with complete restoration);

- U.S. E.P.A. v. Northwoods Organics, Inc., Dkt. No. 5–CWA–95–005, (U.S. E.P.A. Region 5, Mar. 24, 1995), the EPA assessed a $63,000 consent penalty against a peat mining business as part of a settlement of an enforcement action directed to stopping the opening of sites on 1,300 acres of wetlands for peat mining without a § 404 permit.

- United States v. Feinstein Family Partnership, Case No. 96–232 (M.D.Fla.1998), the Court assessed a $400,000 penalty for clearing 24½ acres of wetlands for development of a residential subdivision without a § 404 permit. The proofs showed that the "twenty-four acres of wetlands were previously heavily vegetated" and afterwards "the terrain was flat and water pooled up on the site" ... and that "the damage done to the wetlands was significant."

---

26 Upon review, the Court finds that none are merited in this case.

27 Unpermitted at some point but not necessarily *never* permitted (*e.g.*, "after the fact" permits, etc)

- Borden Ranch Partnership v. Corps of Engineers, 1999 WL 1797329 (E.D. Cal. Nov. 8, 1999), the plaintiff deep ripped and plowed wetlands which degraded and destroyed 2 acres as part of a real estate development. The Court found a lack of earnest effort to comply with the CWA. Plaintiff was fined $1,500,000 reduced to $500,000 if certain restoration measures were undertaken.

- United States v. Cundiff, 555 F.3d 200, 204 (6th Cir. 2009) (assessing a $250,000 civil penalty for illegally draining and filling wetlands but suspending all but $25,000 if restoration plan was followed).

Taking into consideration the case law, evidence, parties' arguments, all of the Section 1319(d) factors, the maximum penalty, the EPA settlement policy penalty, and other factors deemed relevant by this Court, the Court imposes a CWA civil penalty against Smith of **$78,000.**

## III.  Conclusion

Upon consideration, it is **ORDERED** that the Government's request for relief is **DENIED in part** and **GRANTED in part** as detailed *supra* such that:

1) the Government's request for entry of a permanent injunction against Smith is **DENIED;**

2) the Government's request for a temporary restorative injunction (the amended restoration plan for the site) against Smith is **GRANTED in part as described in Attachment A;**

3) the Government's request for compensatory mitigation is **DENIED;**

4) the Government's request for a $1,500,000 civil penalty is **DENIED** as to the amount and **GRANTED** as to a form of relief.   Smith is **ORDERED** to pay, on or before **January 1, 2015,** a CWA civil penalty of **$78,000;** and

5) Smith is **ORDERED** to pay, in annual installments, the cost of the Court's consultant, who will be appointed to monitor compliance with the amended restoration plan (as described in Attachment A).

6)  It is further **ORDERED** that pursuant to Rule 53(a)(1)(C) of the Federal Rules of Civil Procedure,[28] the Court shall appoint a consultant to monitor compliance with the temporary restorative injunction (the restoration plan - Attachment A).   The parties shall file, on or before

---

28 **(a) Appointment. (1)** *Scope.* Unless a statute provides otherwise, a court may appoint a master only to… **(C)** address pretrial and posttrial matters that cannot be effectively … addressed by an available district judge or magistrate judge of the district.   The undersigned is not an expert in complex environmental restoration matters. An experienced consultant who is will be better suited to effectively monitor compliance with the requirements of the temporary restorative injunction issued in this case.

**August 8, 2014**, a Notice of Suggested Candidates for Appointment,[29] identifying the proposed consultant(s) and their credentials, as well as noting whether they are in joint agreement as to any proposed consultant(s).

**DONE** and **ORDERED** this the **24th** day of **July 2014.**

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**

---

29 FED. R.CIV. P. 53(b)(1): "Any party may suggest candidates for appointment." This shall provide the parties with an opportunity to make written submissions to the Court.